UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SANMINA CORPORATION,

                              Plaintiff,

            -v.-

DIALIGHT PLC,

                              Defendant.

---

DIALIGHT PLC,

                              Plaintiff,

            -v.-

SANMINA CORPORATION,

                              Defendant.

---

19 Civ. 11710 (KPF)

**REDACTED OPINION AND ORDER**

19 Civ. 11712 (KPF)

KATHERINE POLK FAILLA, District Judge:

This lawsuit stems from a breakdown in the short-lived commercial relationship between custom light designer Dialight plc ("Dialight") and its contract manufacturer, Sanmina Corporation ("Sanmina") — indeed, the litigation has lasted longer than the relationship. In 2016, Dialight and Sanmina entered into an outsourcing agreement whereby Sanmina would manufacture custom products to Dialight's specifications and ship those products to Dialight and its customers. Although the parties anticipated that this arrangement would endure for years, it fell apart quickly after its inception. Each party now accuses the other of breaching their contract. Dialight additionally accuses Sanmina of inducing it to contract under

fraudulent pretenses and then willfully failing to perform its contractual obligations.  In the instant motion, Sanmina seeks summary judgment on Dialight's tort claims and Sanmina's own claim for unpaid invoices.  For the reasons that follow, the Court grants summary judgment to Sanmina only on Dialight's claim for willful misconduct and leaves the rest of the parties' disputes for trial.

## BACKGROUND[1]

### A.  Factual Background

#### 1.  The Formation of the Commercial Relationship

Dialight designs and manufactures industrial light-emitting diode ("LED") light fixtures for use in safety-critical environments including factories, oil

---

[1]  The facts set forth in this Opinion are drawn from the parties' submissions in connection with Sanmina's motion for partial summary judgment.  The Court draws primarily from Sanmina's Local Civil Rule 56.1 Statement of Material Undisputed Facts (Dkt. #84 ("Sanmina 56.1")), Dialight's Response to Sanmina's Local Civil Rule 56.1 Statement and Statement of Additional Material Facts pursuant to Local Civil Rule 56.1(b) (Dkt. #93 ("Dialight 56.1")), Sanmina's Response to Dialight's Statement of Additional Material Facts (Dkt. #108 ("Sanmina Reply 56.1")), and Sanmina's Objections to Dialight's Responses to Sanmina's Local Civil Rule 56.1 Statement of Material Facts (Dkt. #109 ("Sanmina 56.1 Objections")).  Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  In addition, "[e]ach numbered paragraph in the statement of material facts ... will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civil Rule 56.1(c).

The Court sources additional facts from the declarations submitted by the parties, including Sanmina's Compendium of Evidence (Dkt. #68, 71), and the exhibits attached thereto, including the March 2016 Manufacturing Services Agreement (Dkt. #88-16 ("MSA")) and the Declaration of Scott A. Rader and the exhibits attached thereto (Dkt. #95-99 ("Rader Decl.")).  Other facts sourced from the parties' declarations and their accompanying exhibits are cited using the convention "[Name] Decl., Ex. [ ]."

For ease of reference, the Court refers to Sanmina's brief in support of its motion for partial summary judgment as "Sanmina Br." (Dkt. #83), to Dialight's opposition brief as "Dialight Opp." (Dkt. #92), to Sanmina's reply brief as "Sanmina Reply" (Dkt. #102), to Sanmina's objections to the Rader Declaration as "Rader Obj." (Dkt. #111), and to Dialight's response to Sanmina's objections to the Rader Declaration as "Rader Response" (Dkt. #116).

refineries, and telecommunications towers. (Dialight 56.1 ¶ 71). Rather than selling only mass-produced products, Dialight makes custom products to order. (*Id.* ¶ 73). This "high mix, low volume" approach poses unique manufacturing challenges, as it requires the production of relatively small quantities of a large variety of products. (*Id.* ¶¶ 72-74). Prior to 2015, Dialight manufactured its products in-house at its factories in Mexico, the United Kingdom, the United States, and Malaysia. (Sanmina 56.1 ¶ 10).

In June 2015, Dialight began investigating the possibility of outsourcing its manufacturing to a third party. (Dialight 56.1 ¶¶ 75-77). As part of that process, Dialight contacted multiple potential manufacturing partners, including Sanmina. (*Id.* ¶ 76). Sanmina is a large contract manufacturer with facilities in twenty-five countries. (Sanmina 56.1 ¶ 1). Its Guadalajara, Mexico factories are dedicated to manufacturing lighting equipment, among other products. (*Id.* ¶ 5).

Months of investigation and negotiations between Sanmina and Dialight followed. Dialight retained the consulting firm Ernst & Young to assess its financial readiness to outsource. (Dialight 56.1 ¶ 14). It also hired Robert Fried of Contract Manufacturing Consultants, Inc. as a contract manufacturing expert. (*Id.* ¶ 88). In September 2015, Fried visited a Sanmina factory in Guadalajara to evaluate whether Sanmina would be an appropriate outsourcing partner for Dialight. (*Id.* ¶¶ 89-91). During that visit, Fried toured the factory but was unable to view up close Sanmina's high-mix LED product lines, due to nondisclosure agreements between Sanmina and its other

3

customers.  (*Id.* ¶¶ 90-91).  Fried also prepared a Request for Quote ("RFQ") in which he detailed Dialight's manufacturing needs and asked Sanmina a series of questions about its ability to meet those needs.  (Sanmina Reply 56.1 ¶¶ 83, 95-98).  Sanmina responded to the RFQ in writing on September 20, 2015.  (*Id.* ¶ 100).  That same month, Sanmina gave a presentation to Dialight on its supply-chain capabilities, though the parties dispute what representations were made during that presentation.  (*Id.* ¶¶ 105-113).

In September or October 2015, Sanmina Business Development Manager Bob Green sent Dialight a copy of Sanmina's standard manufacturing services agreement.  (Sanmina 56.1 ¶¶ 21-22).  Dialight, advised by the law firm Wilson Sonsini Goodrich & Rosati, sent proposed revisions back to Sanmina on or about December 3, 2015.  (*Id.* ¶¶ 23-24; *see also* Dkt. #88-15 ("Draft MSA")).  The parties negotiated numerous provisions of their agreement, including which state's law would govern the contract, the number of days Dialight had to reject faulty shipments, limitations on liability, and credit terms.  (Sanmina 56.1 ¶¶ 25-26, 31-33, 35).

### 2. The Manufacturing Services Agreement

Sanmina and Dialight executed their final agreement (the "Manufacturing Services Agreement" or "MSA") on or about March 7, 2016.  (Dialight 56.1 ¶ 46; *see also generally* MSA).  It became effective on March 8, 2016.  (MSA 1).  The recitals to the MSA indicate that Sanmina's "expressed capability to provide ... manufacturing flexibility is one determining factor" in Dialight's choice of Sanmina as its outsourcing partner.  (*Id.* at Recital D).

4

In general terms,[2] the MSA provided for Dialight to send Sanmina periodic purchase orders, which Sanmina could accept and then fulfill by manufacturing the ordered products and delivering them to Dialight or its customers along with an invoice.  (MSA §§ 1, 11).  The MSA afforded Dialight fifteen business days after receipt of each shipment to reject non-compliant goods; after expiration of this time and without any objection, Dialight was deemed to have accepted the shipment.  (*Id.* § 3.6).  Dialight was required to pay invoices within thirty days, but could withhold any payments disputed in good faith.  (*Id.* § 11).  The MSA further provided that Dialight would send Sanmina non-binding monthly projections of its upcoming needs (*id.* § 1.5), and defined procedures for dealing with excess and obsolete materials ordered by Sanmina to fulfill such projected orders but ultimately not utilized (*id.* § 8). The MSA was effective for an initial five-year term, but automatically renewed for successive one-year periods unless terminated by either party with proper notice.  (*Id.* § 21).

Additionally, the MSA contained a limitation of liability provision, which stated that "under no circumstances" would either party be liable to the other "for any special, incidental, indirect consequential damages of any kind," subject to certain specified exceptions.  (MSA § 22.4).  [REDACTED]

---

[2]    The parties' obligations under the MSA are at the heart of the parties' disputes, and the Court does not resolve those disputes now.  The Court merely describes the terms of the MSA in broad strokes for context.  The Court's description should not be taken as a definitive interpretation of the MSA.

### 3.      The Termination of the MSA

By fall 2016, Dialight had begun transferring its product lines to Sanmina for production.  (Dialight 56.1 ¶ 46).  Sanmina processed Dialight's orders from two of its four Guadalajara facilities: Plant 2, which handled top level assembly and testing, and Plant 4, which housed Dialight's computer numerical control machines and paint line.  (*Id.* ¶¶ 158-162).  Dialight alleges, and Sanmina disputes, that Sanmina continuously failed to meet its obligations under the MSA throughout the contract period, including by failing to timely fulfill orders and by fulfilling orders with poorly-produced products. (Sanmina Reply 56.1 ¶¶ 164-265).  Dialight takes particular issue with the quality of Sanmina's production of safety lanyards, alleging that approximately one-third of the lanyards shipped by Sanmina between late 2017 and early 2019 were defective.  (*Id.* ¶¶ 226-255).  For its part, Sanmina alleges, and Dialight disputes, that Dialight breached the MSA by failing to pay approximately $5.3 million in invoices issued by Sanmina for goods accepted by Dialight.  (Dkt. #18 (Sanmina AC ¶¶ 27-34)).  The specifics of these allegations are the subject of the parties' respective breach of contract claims and are largely immaterial to the instant motion.

What is undisputed is that in a letter dated September 27, 2018, Dialight notified Sanmina of its intent to terminate the MSA effective January 31, 2019. (Rader Decl., Ex. 1 (the "Termination Notice"); *see also* Sanmina Reply 56.1 ¶ 267).  Dialight sent the Termination Notice "pursuant to Section 21.1 of [the MSA]" (Termination Notice), which section provides in relevant part that

6

"DIALIGHT may terminate [the MSA] at any time by giving SANMINA at least ninety (90) days prior written notice."  (MSA § 21.1).  In the Termination Notice, Dialight accuses Sanmina of "fail[ing] to meet certain key contractual commitments[,]" causing Dialight to "suffer[] lost customers, lost sales, lost goodwill, lost profits, and many other losses[.]"  (Termination Notice).

The winding down of the parties' business relationship was contentious. Dialight claims that following the termination of the MSA, it invoiced Sanmina for, *inter alia*, fixed assets it paid for at Sanmina's plants.  (Dialight 56.1 ¶¶ 271-272).  Sanmina disputes the admissibility of those invoices, but admits that it has not paid them.  (Sanmina Reply 56.1 ¶¶ 271-272).  The parties agree that Sanmina currently holds approximately $5.3 million deposited by Dialight in an Offset Inventory Reserve Account.  (*Id.* ¶ 267).

## B.  Procedural Background

This action began on December 20, 2019, when Sanmina filed a complaint against Dialight (19 Civ. 11710 Dkt. #1) and Dialight filed a complaint against Sanmina (19 Civ. 11712 Dkt. #2 ("Dialight Compl.")).  On January 7, 2020, the Court accepted Dialight's case as related to Sanmina's. (19 Civ. 11712, Minute Entry for January 7, 2020; *see also* 19 Civ. 11710 Dkt. #7-8).[3]

---

[3]     Most documents filed after the Court accepted Case No. 19 Civ. 11712 as related to Case No. 19 Civ. 11710 appear on the dockets of both cases.  In the interests of efficiency, the Court refers to the docket of the earlier-filed action (No. 19 Civ. 11710) unless otherwise specified.  In so doing, the Court does not suggest the absence of any filing from the other docket.

In January 2020, Sanmina filed a letter requesting a conference to discuss its intended motion to dismiss Dialight's claims for fraudulent inducement and gross negligence. (Dkt. #11). Shortly thereafter, Dialight filed a letter requesting a conference to discuss its intended motion to dismiss Sanmina's unpaid invoices claim. (Dkt. #12). Sanmina then amended its complaint as of right on February 3, 2020. (Dkt. #18 ("Sanmina AC")). Also in February 2020, Dialight filed a letter reiterating its intent to file a partial motion to dismiss. (Dkt. #22). The Court held a conference regarding the parties' anticipated motions on March 25, 2020. On April 7, 2020, the parties reported their mutual agreement not to file their contemplated motions (Dkt. #28), and each party filed an answer to the other's operative complaint on April 27, 2020 (Dkt. #31; 19 Civ. 11712 Dkt. #28).

The case then proceeded to discovery. On May 15, 2020, the Court entered the parties' proposed case management plan. (Dkt. #37). Approximately two months later, the Court entered the parties' proposed confidentiality stipulation and protective order. (Dkt. #38). On several occasions, the Court extended the discovery deadlines upon the joint request of the parties. (*See, e.g.*, Dkt. #40, 45; *see also* Minute Entry for October 20, 2021). Some of the need for additional time stemmed from challenges in collecting evidence located in other countries. (*See, e.g.*, Dkt. #46-47, 57-58 (requesting the assistance of British, Irish, Canadian, and Mexican courts in the taking of foreign evidence)).

The Court held a pretrial conference on October 20, 2021, at which the parties expressed their desire to participate in private mediation.  (*See* Dkt. #67).  On January 31, 2022, the parties reported that their effort to reach a pretrial resolution of this matter through private mediation had been unsuccessful.  (Dkt. #69).

On February 9, 2022, Sanmina filed a letter requesting a conference to discuss its anticipated motion for partial summary judgment.  (Dkt. #71).  Dialight filed a letter detailing its opposition to the intended motion on February 18, 2022.  (Dkt. #72).  On March 17, 2022, the Court held a conference at which it set a briefing schedule for Sanmina's motion.  (Minute Entry for March 17, 2022).

Sanmina filed its motion for partial summary judgment and accompanying papers on May 2, 2022.  (Dkt. #81, 83-88).  Dialight filed its opposition and accompanying papers on June 17, 2022.  (Dkt. #92-99).  Sanmina filed its reply and accompanying papers on July 18, 2022.  (Dkt. #102-110, 112).  The Court granted the parties' requests to file certain of the foregoing documents with redactions and/or under seal.  (Dkt. #90, 100).  Also on July 18, 2022, Sanmina filed an objection challenging the Court's ability to consider many of the exhibits attached to the Declaration of Scott A. Rader in support of Dialight's opposition.  (Dkt. #111).  On July 22, 2022, Dialight sought the Court's leave to file a sur-reply (Dkt. #113), which request Sanmina opposed (Dkt. #114).  The Court granted Dialight's request in part, permitting it to respond to Sanmina's objections to Mr. Radar's declaration, but denying its

request to respond to Sanmina's objections to its responses to Sanmina's Local Rule 56.1 statement. (Dkt. #115). Dialight filed its sur-reply on July 27, 2022. (Dkt. #116).

## DISCUSSION

Sanmina brings two claims against Dialight: (i) breach of contract for failure to pay approximately $5.3 million in outstanding invoices for delivered goods (Sanmina AC ¶¶ 27-43); and (ii) breach of contract for failure to pay approximately $4.55 million for excess and obsolete materials ordered in accordance with Dialight's forecasts but never utilized (*id.* ¶¶ 35-42). Dialight, in turn, brings three claims against Sanmina: (i) fraudulent inducement to enter the MSA (Dialight Compl. ¶¶ 67-74); (ii) breach of contract for, *inter alia*, failing to ship complete, timely, and conforming orders (*id.* ¶¶ 75-100); and (iii) gross negligence/willful misconduct for failure to discharge its duty to refrain from negligently or intentionally harming Dialight's business operations (*id.* ¶¶ 101-107).

Sanmina moves for summary judgment on only three claims, namely, Dialight's tort claims for fraudulent inducement and willful misconduct, and Sanmina's own breach of contract claim for unpaid invoices. (Sanmina Br. 1-2). In the alternative, Sanmina seeks a ruling that the MSA's limitation of liability provisions are fully enforceable. (*Id.*). For the reasons that follow, the Court grants Sanmina' motion only as to Dialight's willful misconduct claim.

A.      **Summary Judgment Under Federal Rule of Civil Procedure 56**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[4]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely disputed "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

While the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex Corp.*, 477 U.S. at 323, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (citing Fed. R. Civ. P. 56(e)).

---

[4]      The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.  *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  In considering "what may reasonably be inferred" from evidence in the record, however, the Court should not afford the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts."  *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).  Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."  *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587).

## B.    The Court May Consider the Exhibits to the Declaration of Scott A. Rader

As a threshold matter, the Court addresses Sanmina's challenge to the Court's consideration of the exhibits to the declaration of Dialight's counsel, Scott A. Rader (Dkt. #95-99 (the "Rader Declaration")).  Sanmina objects to the Rader Declaration "to the extent it purports to authenticate documents that were never testified about" — in other words, Sanmina maintains that Mr. Rader may only introduce exhibits about which he has personal knowledge. (*See generally* Rader Obj.).  Sanmina also objects to various exhibits it believes are inadmissible because they contain hearsay or include Spanish-language text without certified English translations.  (*Id.*).  Dialight responds that

12

attorney declarations are the standard method of filing summary judgment exhibits in this District and that such filings are permitted under Federal Rule of Civil Procedure 56.  (Rader Response 1-3).  Dialight is correct.

Had this issue arisen before the 2010 amendments to the Federal Rules of Civil Procedure, the challenged exhibits could not have been properly considered on summary judgment.  Before 2010, Rule 56's authentication requirements for documents relied upon in a summary judgment motion were "strict and technical."  *Brito* v. *Lucky Seven Rest. & Bar, LLC*, No. 19 Civ. 3876 (PAE) (KHP), 2021 WL 1131506, at *6 (S.D.N.Y. Mar. 24, 2021).  But the 2010 amendments removed the "unequivocal requirement" that documents submitted in connection with summary judgment be authenticated.  *Archie MD, Inc.* v. *Elsevier, Inc.*, No. 16 Civ. 6614 (JSR), 2017 WL 3421167, at *1 n.2 (S.D.N.Y. Mar. 13, 2017) (quotations and citation omitted).  As amended, Rule 56 merely requires that supporting documents "be in a form that, if authenticated, could be admissible at trial."  *Id.*  (citing Fed. R. Civ. P. 56(c)(2)).  The admissibility question, therefore, is not whether Dialight presented the exhibits in an admissible form in its motion response, but whether Dialight *could* present them in such a form at trial.

Dialight's exhibits clear Rule 56(c)'s low bar for authentication.  The personal knowledge requirement "applies slightly differently to declarations of attorneys, which are frequently allowed to function as 'vehicles to introduce evidence produced in discovery into the record in a cohesive manner.'"  *Cancel* v. *N.Y.C. Human Res. Admin./Dep't of Soc. Servs.*, No. 11 Civ. 9725 (PKC), 2014

WL 5508487, at *4 (S.D.N.Y. Oct. 31, 2014) (alteration adopted) (quoting *Genon Mid.-Atl., LLC* v. *Stone & Webster, Inc.*, No. 11 Civ. 1299 (HB), 2012 WL 1372150, at *2 (S.D.N.Y. Apr. 18, 2012)).  The Court accepts Mr. Rader's attestation that each of the exhibits is a "true and correct copy" of a document produced in discovery.  (*See* Rader Decl. ¶¶ 2-229 (Dkt. #95)).  "[O]n that issue … counsel is competent to testify because of his involvement in this litigation." *Hallett* v. *Stuart Dean Co.*, 517 F. Supp. 3d 260, 268 (S.D.N.Y. 2021).  Mr. Rader's declaration is thus sufficient to authenticate the exhibits at this stage in the litigation.  *See id.* at 268-69; *Archie MD, Inc.*, 2019 WL 3421167, at *1 n.2; *see also Bruce Lee Enters., LLC* v. *A.V.E.L.A., Inc.*, No. 10 Civ. 2333 (KMW), 2013 WL 822173, at *7 (S.D.N.Y. Mar. 6, 2013) (both rejecting objections based on failure to authentic exhibits to attorney declarations).

Sanmina's more specific objections fare no better.  A party may object that the "material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  Sanmina offers a chart listing thirty-seven exhibits it believes to be hearsay, four it believes lack proper translations, and one it believes asserts an improper expert opinion.  (Rader Obj. 3).  As to the translation issue, the Court accepts Dialight's assertion that it relies on only the English portions of the exhibits in its briefing.  (Rader Response 5).  But more importantly, Sanmina does not — nor could it — argue that Dialight could not offer the exhibits with the requisite translations at trial.  *See Parks* v. *Blanchette*, 144 F. Supp. 3d 282, 299 (D.

Conn. 2015) (emphasizing that Rule 56(c)(2) requires only that "the evidence must be capable of presentation in admissible form at the time of trial").

It is difficult for the Court to address Sanmina's hearsay concerns because Sanmina does not give any explanation for its objections beyond merely stating in conclusory fashion that certain exhibits are inadmissible. (*See generally* Rader Obj.).  In contrast, Dialight offers colorable arguments that many if not all of the challenged exhibits could be admissible under the hearsay exceptions for business records and statements made by a party opponent.  (*See* Rader Response 4).  But even if the exhibits might contain inadmissible hearsay, "the Court sees no reason why each cited document could not be introduced in evidence by an author or declarant[.]"  *Hallett*, 517 F. Supp. 3d at 268.  The same is true for Sanmina's concern about the admissibility of an October 2019 report by Dialight employee Angel Escamilla regarding the tool Sanmina used to crimp safety lanyards.  (Rader Decl., Ex. 215).  Sanmina deems the report an "Improper Expert Opinion[.]"  (Rader Obj. 3).  But it does not explain why Escamilla could not testify to his investigation as a lay witness with firsthand knowledge of the condition of the lanyards upon delivery by Sanmina under Federal Rule of Evidence 701.  In short, because Sanmina has not shown that Dialight could not possibly submit the challenged exhibits in admissible form at trial, the Court may consider the exhibits to the Rader Declaration.

C.    **Sanmina Is Not Entitled to Summary Judgment on Dialight's Fraudulent Inducement Claim**

The Court now proceeds to consider the merits of Sanmina's summary judgment arguments, beginning with its attack on Dialight's claim of fraudulent inducement.  A party may invalidate a contract, including any contractual limitation on liability, by proving that it was induced to enter the contract under fraudulent pretenses.  *See Shapiro* v. *NFGTV, Inc.*, No. 16 Civ. 9152 (PGG), 2018 WL 2127806, at *6 (S.D.N.Y. Feb. 9, 2018).  To succeed on a claim of fraudulent inducement under New York law,[5] the claimant must show that: "[i] the defendant made a material false representation, [ii] the defendant intended to defraud the plaintiff thereby, [iii] the plaintiff reasonably relied upon the representation, and [iv] the plaintiff suffered damages as a result of such reliance."  *Axginc Corp.* v. *Plaza Automall, Ltd.*, 759 F. App'x 26, 30 (2d Cir. 2018) (summary order) (quoting *Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996)).  In addition, allegations of fraud must "[i] specify the statements that the plaintiff contends were

---

[5]    The parties disagree about whether the MSA is governed by New York's Uniform Commercial Code ("UCC") or common law.  (*Compare* Sanmina Br. 9 (asserting that the MSA is primarily a contract for goods governed by the UCC), *with* Dialight Opp. 10-11 (asserting that the MSA is primarily a contract for services governed by common law)). Based on the Court's research, Dialight appears to have the better of the argument. *See Arrow Elecs., Inc.* v. *Deco Lighting, Inc.*, No. 18 Civ. 1100 (RM) (KLM), 2019 WL 5095739, at *5 (D. Colo. Aug. 9, 2019) (deeming the provision of services the predominant purpose of a contract to source, store, and ship products directly to contracting partner's customers).  As it happens, however, the Court need not reach this issue.  Contractual limitations of liability are generally enforceable under both the UCC and common law.  And both the UCC and common law recognize that tort claims of the type raised by Dialight — fraudulent inducement and willful misconduct — can void a contract, including any limitation of liability provisions.  *See VisionChina Media Inc.* v. *Shareholder Rep. Servs., LLC*, 967 N.Y.S.2d 338, 343 (1st Dep't 2013).  The distinction between the dueling legal schemes is thus without a meaningful difference.

fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *Nakahata* v. *N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (citation omitted); *see also* Fed. R. Civ. P. 9(b).

Dialight claims that Sanmina fraudulently induced it to enter the MSA "by falsely representing that it already possessed the necessary experience and capacity to satisfy the demands of Dialight's 'high mix/low volume' production model." (Dialight Compl. ¶ 68).  In support of its theory, Dialight identifies several allegedly false statements made by Sanmina that it relied on in deciding to enter the MSA, including statements that: (i) Sanmina had the machining and paint-line capability to handle Dialight's complex manufacturing needs; (ii) the two company's IT systems were compatible without integration; (iii) Sanmina would make specific supply-chain tools available for Dialight's account at Plant 2; (iv) Sanmina's finance team supported the companies' partnership; (v) Sanmina provided accurate financial information to Dialight during negotiations; (vii) Sanmina had manufacturing space available for Dialight at its Guadalajara facilities; and (viii) Sanmina could provide complete vertical integration from a single profit center.  (Dialight Opp. 13-15).[6]

---

[6]   Sanmina takes issue with Dialight's invocation of some of these statements, arguing that Dialight cannot rely on evidence revealed in discovery about specific (alleged) misstatements that Dialight did not detail in its complaint.  (Sanmina Br. 15-16). Sanmina's point that Dialight should have been aware of what it relied on at the time of pleading is well-taken, but so is Dialight's point that it may not have known the truth or falsity of specific representations until discovery.  The more important point is that there is no unfair surprise to Sanmina; the specific misstatements Dialight invokes each support the more generalized allegation in Dialight's pleading that Sanmina lied about having the experience and capacity to service Dialight's account.  (*See* Dialight Compl. ¶ 68).

In Sanmina's view, Dialight's fraudulent inducement claim fails as a matter of law both because it is duplicative of Dialight's breach of contract claim and because it was not reasonable for Dialight to rely on the asserted misrepresentations.  (Sanmina Br. 11-19).[7]  The Court addresses each argument in turn.

### 1. Dialight's Fraudulent Inducement Claim Is Not Duplicative of Its Breach of Contract Claim

A fraud claim that "is simply a breach of contract claim in [] tort clothing" is not cognizable as a freestanding claim.  *Telecom Int'l Am. Ltd.* v. *AT & T Corp.,* 280 F.3d 175, 196 (2d Cir. 2001).  In other words, an allegation of fraudulent inducement "may not be used as a means of restating what is, in substance, a claim for breach of contract," and "general allegations that [a] defendant entered into a contract while lacking the intent to perform it are insufficient to support a fraud claim.'"  *Wall* v. *CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (internal quotation marks and citation omitted); *see also Telecom Int'l Am. Ltd.,* 280 F.3d at 196 ("[W]here a fraud claim arises out of the same facts as [the] plaintiff's breach of contract claim, with the addition only of an allegation that [the] defendant never intended to perform the precise

---

[7]    The Court does not consider additional legal arguments made in Sanmina's Local Rule 56.1 statement regarding whether specific statements can support a fraud claim.  *See Congregation Rabbinical Coll. of Tartikov, Inc.* v. *Village of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) ("[T]he Court can also disregard legal conclusions ... in a Local Rule 56.1 statement."); *Simmons* v. *Woodycrest Ctr. for Human Dev't, Inc.,* No. 10 Civ. 5193 (JSR), 2011 WL 855942, at *1 n.1 (S.D.N.Y. Mar. 9, 2011) (disregarding portions of Local Rule 56.1 statement consisting of legal conclusions).  In any event, many of those arguments speak to disputed facts about the materiality of Sanmina's statements and the reasonableness of Dialight's reliance.  And Sanmina's remaining arguments speak to whether Dialight's fraudulent inducement claim is duplicative of its fraud claim, which the Court addresses in depth in Section C.1, *infra.*

promises spelled out in the contract between the parties, the fraud claim is redundant and [the] plaintiff's sole remedy is for breach of contract." (quoting *Sudul* v. *Comput. Outsourcing Servs.,* 868 F. Supp. 59, 62 (S.D.N.Y. 1994))). To maintain a claim for fraud that does not merge with a breach of contract claim, Dialight must:

> (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.

*Bridgestone/Firestone,* 98 F.3d at 20 (citations omitted).

Dialight bases its fraudulent inducement claim on the second of these theories: It alleges that Sanmina made fraudulent misrepresentations collateral or extraneous to the MSA. As to this type of claim, courts have recognized a key distinction between a misrepresentation of present fact, which is actionable, and a misrepresentation of future intent to perform under the contract, which merges with the contract claim and thus cannot support a separate fraud claim. *See, e.g., Gosmile, Inc.* v. *Levine,* 915 N.Y.S.2d 521, 524 (1st Dep't 2010) ("To state a claim for fraudulent inducement, there must be a knowing misrepresentation of material present fact, which is intended to deceive another party and induce that party to act on it, resulting in injury .... [A] misrepresentation of present fact, unlike a misrepresentation of future intent to perform under the contract, is collateral to the contract, even though it may have induced the plaintiff to sign it, and therefore involves a separate breach of duty." (citations omitted)). In other words, "simply dressing up a

breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder is insufficient to state an independent tort claim." *Telecom Int'l Am. Ltd.,* 280 F.3d at 196 (citations and internal quotation marks omitted).

Examples illustrate this distinction. A party's representation that, for instance, it will distribute the other party's funds to third parties as specified in a written agreement is a promise to perform cognizable only in contract. *See Coughlan* v. *Jachney*, 473 F. Supp. 3d 166, 193-94 (E.D.N.Y. 2020). But "induc[ing] someone to enter a contract by lying as to one's current financial condition, present ability to perform, and the like" can support a separate tort claim. *Wild Bunch, SA* v. *Vendian Ent., LLC*, 256 F. Supp. 3d 497, 506 (S.D.N.Y. 2017). To that end, courts have found that false statements that a party is capable of investing a specified sum without further approval or contingencies, *id.* at 506-07; or that a party presently has the resources to indemnify the other for fees and costs related to their transaction, *KCG Ams. LLC* v. *Brazilmed, LLC*, No. 15 Civ. 4600 (AT), 2016 WL 900396, at *4 (S.D.N.Y. Feb. 26, 2016), are collateral misrepresentations cognizable in tort. The difference between promises to perform and representations about present facts can be subtle, and can boil down to the difference between a statement that a party "will" perform and a statement that a party "can" perform. *See KCG Ams.*, 2016 WL 900396, at *4 (citing *Chase* v. *Columbia Nat'l Corp.,* 832 F. Supp. 654, 661 (S.D.N.Y. 1993)).

Sanmina's (allegedly) false representations about its capacity to meet the demands of Dialight's production model are collateral to the MSA and thus cognizable in tort.  Had Sanmina simply represented that it would fulfill Dialight's orders, a claim that it never intended to abide by that promise would merge into a breach of contract claim.  *See First Bank of the Ams.* v. *Motor Car Funding, Inc.*, 690 N.Y.S. 2d 17, 20-21 (1st Dep't 1999).  But taking the facts in the light most favorable to Dialight, Sanmina did more than state its intent to perform — it made specific representations about its present finances and credit as well as about the existing equipment, IT systems, supply-chain tools, and floor space available at its Guadalajara factories for the Dialight account.  For instance, Fried understood from his visit to Sanmina's Guadalajara factories that there was "excellent space available" for production of Dialight's products, including 35,000 square feet of manufacturing space at Plant 4.  (Rader Decl., Ex. 124).  Similarly, Sanmina represented in its RFQ response that it was outfitted to support Dialight's high-mix, low-volume production model.  (Sanmina Reply 56.1 ¶ 97).  These and similar statements pertain to facts in existence (or not) at the time the statements were made, and support Dialight's allegation that Sanmina "falsely represent[ed] that it already possessed the necessary experience and capacity to satisfy the demands of Dialight's 'high mix/low volume' production model."  (Dialight Compl. ¶ 68).  As such, Dialight's claim is of the type cognizable in tort.  *See Wild Bunch*, SA, 256 F. Supp. 3d at 506 ("Courts … cannot recharacterize statements that are unmistakably about present facts … as being about future intent to

21

perform.  Indeed, such an approach would severely undercut the fraudulent inducement cause of action, because lies about one's solvency and abilities to perform are exactly the sorts of lies that would likely induce a counterparty to enter a contract.").

The statements at issue are similar in nature to the representations that supported a fraudulent inducement claim in *Fung-Schwartz* v. *Cerner Corporation*, No. 17 Civ. 233 (VSB), 2019 WL 4393022 (S.D.N.Y. Sept. 13, 2019).  There, a podiatrist and her medical practice claimed that they were fraudulently induced to enter a contract for the provision of electronic medical recordkeeping.  *Id.* at *1.  The podiatrist alleged that prior to contracting, the record-keeper falsely represented, among other things, that it had the technical capability and the personnel necessary to handle the podiatrist's reimbursement and billing needs.  *Id.*  The *Fung-Schwartz* court found these statements collateral to the contract, explaining that they pertained to the record-keeper's current ability to perform rather than its intent to perform.  *Id.* at *5.  As in *Fung-Schwartz*, the instant claim involves representations that a party could fulfill its contractual obligations because it has certain resources or capacity.

The Court does, however, agree with Sanmina that the representation that Dialight entered the MSA in part because of Sanmina's ability to service Dialight's needs from a single profit center does not support Dialight's claim. Fraudulent inducement pertains only to *pre-contractual* statements.  *See PetEdge, Inc.* v. *Garg*, 234 F. Supp. 3d 477, 492 (S.D.N.Y. 2017) ("[P]re-

contractual conduct … is the only conduct that is relevant to the fraudulent inducement claim[.]").  Sanmina's representation about its profit center is not extraneous or collateral to the contract; it was made in Recital D to the MSA, and thus is part of the contract.  (*See* MSA 1 (Recital D)).  Accordingly, this statement does not support Dialight's claim that Sanmina lied about its ability to handle Dialight's account.  The Recital may, however, be relevant to the materiality or reliance elements of the fraudulent inducement claim.

### 2. Whether Dialight's Reliance on Sanmina's Allegedly False Representations Was Reasonable Is a Disputed Fact

Sanmina next argues that even if Dialight's fraudulent inducement claim were cognizable, it must fail because it was not reasonable for Dialight to rely on the contested statements.  More specifically, Sanmina claims that because the MSA is the product of negotiations between sophisticated parties, the Court must give effect to its merger clause and find it unreasonable as a matter of law for Dialight to rely on its extra-contractual representations.  (Sanmina Br. 17-18).  In response, Dialight argues that merger clauses do not preclude parol evidence regarding fraudulent inducement and asserts that it was misled despite doing its due diligence prior to entering the MSA.  (Dialight Opp. 18-20).

To succeed on a fraudulent inducement claim, the claimant must establish that it reasonably relied on the other party's materially false representation in making its decision to contract.  *Axginc Corp*, 759 F. App'x at 30.  The reasonableness of reliance is determined in consideration of "the entire context of the transaction, including … its complexity and magnitude,

23

the sophistication of the parties, and the content of any agreements between them." *Crigger* v. *Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006); *see also Emergent Cap. Inv. Mgmt., LLC* v. *Stonepath Grp., Inc.*, 165 F. Supp. 2d 615, 622-23 (S.D.N.Y. 2001) ("The integration clause, the entire contract, and the sophistication and knowledge of the parties must be considered in order to assess the reasonableness of a party's reliance."). Because reasonableness requires analysis of the totality of the circumstances, it is "a nettlesome and fact intensive question, and thus is often a question of fact for the jury rather than a question of law for the court." *FIH, LLC* v. *Found. Cap. Partners LLC*, 920 F.3d 134, 141 (2d Cir. 2019) (internal citations and quotation marks omitted).

Sanmina is correct that Dialight's status as a counseled and well-advised negotiator is relevant to this determination. In assessing whether reliance is justified, "New York courts are generally skeptical of claims of reliance asserted by 'sophisticated businessmen engaged in major transactions who enjoy access to critical information but fail to take advantage of that access.'" *Merrill Lynch & Co. Inc.* v. *Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007) (alteration adopted) (quoting *Grumman Allied Indus., Inc.* v. *Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir. 1984)). But that skepticism does not transform the factual question of reasonableness into a legal one. "Standing alone ... a general merger clause[] is not sufficient as a matter of law to preclude reasonable reliance on material factual misrepresentations, even by a sophisticated [party]." *FIH, LLC*, 920 F.3d at 141. Ultimately, the party

claiming fraud "must offer proof that its reliance on the alleged misrepresentations was not so utterly unreasonable, foolish or knowingly blind as to compel the conclusion that whatever injury it suffered was its own responsibility," in light of its sophistication and any contractual disclaimers of reliance on external representations. *Merrill Lynch*, 500 F.3d at 182.

The reasonableness of Dialight's reliance on Sanmina's extra-contractual representations is a disputed fact. This is not a case where the claimed fraud obviously could have been discovered with minimal diligence or directly contradicts specific terms of the parties' written agreement. *Cf. Emergent Cap. Inv. Mgmt., LLC*, 165 F. Supp. 2d at 622-23 (dismissing fraudulent inducement claim because sophisticated party could have readily ascertained falsity of statement by asking to see insurance policy); *Harsco Corp.* v. *Segui,* 91 F.3d 337, 345 (2d Cir. 1996) (dismissing fraudulent inducement claim because allegations of fraud were directly contradicted by specific contractual disclaimers). Sanmina does not allege that the MSA's merger clause specifically disclaims reliance on the statements at issue. And a jury could find that Dialight conducted a reasonable investigation into Sanmina's manufacturing capacity prior to executing the MSA — including by sending its expert consultant to Mexico for a site visit and sending Sanmina a detailed RFQ (*see* Dialight 56.1 ¶¶ 88-91; Sanmina Reply 56.1 ¶¶ 83, 95-100) — but was nonetheless misled by statements that it could not, or reasonably did not, fact-check. These circumstances create a fact question as to whether this

sophisticated entity, exercising reasonable prudence, should have known not to rely on Sanmina's representations.  *See Crigger*, 443 F.3d at 236.

Because Sanmina's purported misrepresentations about its capacity are distinct from the terms of the MSA, Dialight's fraudulent inducement claim should be submitted to a jury.  That jury may ultimately agree with Sanmina that Dialight's claim fails because, for instance, Sanmina's representation about its capability was true when made, or Sanmina's representation was not material to Dialight's decision to contract with Sanmina, or it was not reasonable for Dialight to rely on Sanmina's representation.  (*See* Sanmina Reply 4-8).  But it is not the Court's role to resolve those disputed facts at this stage in the litigation, particularly where Sanmina has not moved on these issues.  Accordingly, Sanmina is not entitled to summary judgment on Dialight's fraudulent inducement claim.  Relatedly, because a ruling in Dialight's favor on this claim could void the MSA and/or its limitation of liability provision, *see supra* n.5, the Court denies Sanmina's request for a declaration that the MSA's contractual limitations of liability are valid and enforceable.  (*See* Sanmina Br. 1).

## D.    Sanmina Is Entitled to Summary Judgment on Dialight's Willful Misconduct Claim

Sanmina also seeks summary judgment on Dialight's claim for willful misconduct.[8]  This claim is premised on Sanmina's *post*-contract actions;

---

[8]    Although Dialight's pleading styles this claim as one for gross negligence *or* willful misconduct (*see* Dialight Compl. ¶¶ 101-107), it has since abandoned its gross negligence theory in light of the New York Court of Appeals' recent holding that a gross negligence finding voids only exculpatory and nominal damages provisions in contracts.

Dialight alleges that that Sanmina breached its duty to refrain from intentionally harming its business operations by failing to take steps to improve its performance or mitigate damages and by fulfilling Dialight's orders with defective products despite knowing that defects could harm Dialight's customers.  (*See* Dialight Compl. ¶¶ 101-107).  In Sanmina's view, this claim must fail because it does not owe Dialight any duty independent from its contractual obligations and because the facts alleged do not rise to the level of misconduct necessary to sustain a willful misconduct claim.  (Sanmina Br. 19-22; Sanmina Reply 8-9).  Because the Court agrees with Sanmina on the first point, it does not reach the second.

While parties may "contract[ ] for ... exclusive remedy provision[s]," they "cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct."  *Citibank, N.A.* v. *Itochu Int'l Inc.*, No. 01 Civ. 6007 (GBD), 2003 WL 1797847, at *2 (S.D.N.Y. Apr. 4, 2003) (quoting *Turkish* v. *Kasenetz*, 27 F.3d 23, 27-28 (2d Cir. 1994)); *see also Koch* v. *Greenberg*, No. 07 Civ. 9600 (BSJ) (DCF), 2012 WL 7997484, at *6 (S.D.N.Y. Sept. 30, 2012).  A claim of willful misconduct requires proof of four elements: "[i] the existence of a duty; [ii] a breach of that duty; [iii] injury as a result thereof; and [iv] conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing[.]"  *Purchase Partners, LLC* v.

---

*Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 354 (2020).  By contrast, a finding of willful or intentional wrongdoing may void a contractual limitation of liability provision.  *See Spoleto Corp.* v. *Ethiopian Airlines Grp.*, No. 21 Civ. 5407 (PAE), 2022 WL 329265, at *8 n.3 (S.D.N.Y. Feb. 3, 2022).

*Carver Fed. Savs. Bank*, 914 F. Supp. 2d 480, 497 (S.D.N.Y. 2012) (internal citation and quotation marks omitted); *see also Air China, Ltd.* v. *Kopf*, 473 F. App'x 45, 49 (2d Cir. 2012) (summary order) (explaining that damage-limitation provisions may be ineffective where "the defendants' conduct … 'smacks of intentional wrongdoing' and amount[s] to egregious intentional misbehavior").

The Court examines the duty prong of Dialight's claim. A tort claim that related to contractual obligations "must be dismissed unless [it is] premised on a breach of a duty arising independently of the contract." *Teachers Ins. & Annuity Ass'n of Am.* v. *CRIIMI Mae Servs. Ltd. P'ship*, No. 06 Civ. 392 (LAK), 2007 WL 7569162, at *1 (S.D.N.Y. Sept. 7, 2007); *accord Clark-Fitzpatrick, Inc.* v. *Long Island R. Co.,* 70 N.Y.2d 382, 389 (1987). Such an independent duty can stem from a contracting party's professional obligations, such as the "trust and confidence" inherent in the lawyer-client relationship or fiduciary relationship. *Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 408 (S.D.N.Y. July 5, 2005); *see also Bullmore* v. *Banc of Am. Secs. LLC*, 485 F. Supp. 2d 464, 470-71 (S.D.N.Y. 2007). Because contract law seeks to restore to parties the benefit of their bargain, while tort law seeks to prevent harm to others, an independent duty exists only for those professions whose work serves a significant public interest and whose breach of contract could have catastrophic consequences for the public at large. *See, e.g.*, *Hydro Invs., Inc.* v. *Trafalgar Power Inc.*, 227 F.3d 8, 17 (2d Cir. 2000) (citing *Sommer* v. *Fed. Signal Corp.*, 79 N.Y.2d 540 (1992)). The range of professions subject to special tort duties is limited: otherwise, "almost every breach of contract claim

potentially would turn into a parallel claim for gross negligence." *CRIIMI Mae Servs. Ltd. P'ship*, 2007 WL 7569162, at *1.

Dialight claims that Sanmina owes it an independent duty because Sanmina held itself out as an expert in contract manufacturing. (Dialight Opp. 21-22). But Dialight points to no authority imposing an extracontractual duty of care on contract manufacturing experts. *See Avazpour Networking Servs., Inc.* v. *Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 363-64 (E.D.N.Y. 2013) (finding that professional computer consultants do not owe their clients an independent legal duty); *Great N. Ins. Co.* v. *ADT LLC*, No. 21 Civ. 685 (BKS), 2022 WL 833320, at *4 (N.D.N.Y. Mar. 21, 2022) (finding that alarm companies do not owe tort duties to their subscribers). Nor does the fact that Sanmina may be subject to industry standards (*see* Dialight Opp. 21-22), automatically create a tort duty to abide by those standards. *See CRIIMI Mae Servs. Ltd. P'ship*, 2007 WL 7569162, at *1 (dismissing gross negligence claim because tort claimant failed to identify authority holding that duty was imposed by law rather than the party's contract).[9] Dialight will have an opportunity to hold Sanmina to account for its allegedly lackluster performance. But lacking any basis to find Sanmina subject to an independent duty of care, the Court finds Dialight's willful misconduct claim duplicative of its claim for breach of contract. *See Bayerische Landesbank* v. *Aladdin Cap. Mgmt. LLC*, 692 F.3d 42,

---

[9]     In so concluding, the Court recognizes that industry standards may define the standard of care when an independent duty exists. *See Uzhca* v. *Wal-Mart Stores, Inc.*, No. 17 Civ. 3850 (NSR), 2020 WL 5518591, at *7-8 (S.D.N.Y. Sept. 14, 2020) (concluding that whether industry standards defined the standard of care is a fact question).

58 (2d Cir. 2012) ("If, however, the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative.")).

**E.      Sanmina Is Not Entitled to Summary Judgment on Its Accounts Receivable Claim**

Finally, Sanmina seeks summary judgment on its first breach of contract claim, for which it seeks approximately $5.3 million plus interest for "goods and materials that Dialight ordered from Sanmina, Sanmina shipped to Dialight, Dialight did not timely reject, and for which Dialight failed to pay." (Sanmina Br. 22-23; *see also* Sanmina AC ¶¶ 27-34).  Sanmina asserts that it is owed that sum per the MSA's terms because it sent Dialight invoices contemporaneously with its shipments and Dialight did not reject the shipments within the acceptance period defined in the MSA.  (*See* MSA § 3.6 ("Acceptance of Product shall occur no later than fifteen (15) business days after the shipment of Product and shall be based on whether the Products shipped meet[] the Product or Order Specifications .... Product shall be deemed accepted if not rejected within such fifteen-day period.")).

Dialight disputes Sanmina's characterization of the facts, maintaining that "roughly twenty percent of Sanmina's accounts receivable claim is in factual dispute because the evidence shows it is based on product that [Sanmina] never shipped or shipped with material defects."  (Dialight Opp. 25; *see also* Dialight 56.1 ¶¶ 63-70).  To support its view of the facts, Dialight cites, among other things, the deposition testimony of former Dialight financial

controller Ronan Sheehy.  (*See* Rader Decl., Ex. 22).  As relevant here, Mr.

Sheehy testified that on multiple occasions Sanmina billed Dialight for goods it

did not ship (or that were not delivered); Dialight rejected portions of the

relevant goods following inspection; and Dialight sent Sanmina regular emails

detailing its rejection of delivered goods.  (*Id.* at 349-55).  Dialight has thus met

its burden of identifying evidence in the record sufficient to establish a genuine

issue for trial on Sanmina's accounts receivable claim.  *See Parks Real Estate

Purchasing Grp.*, 472 F.3d at 41.

## CONCLUSION

Sanmina's summary judgment motion is GRANTED as to Dialight's

willful misconduct claim and DENIED as to Dialight's fraudulent inducement

claim and Sanmina's own accounts receivable claim.

The Clerk of Court is directed to file this Opinion in Case Nos. 19 Civ.

11710 and 19 Civ. 11712.

SO ORDERED.

Dated:     March 14, 2023
           New York, New York

_____
       KATHERINE POLK FAILLA
       United States District Judge